Such being the case it is unnecessary to discuss the further point raised by the defendant that the conduct of the plaintiff has been inequitable and unconscionable, and that he is not entitled to equitable relief.

Judgment for defendant, dismissing the complaint upon the merits, with costs. Findings passed upon. Judgment signed.

---

(175 App. Div. 97)

GLOBE MALLEABLE IRON & STEEL CO. et al. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. July 6, 1916.)

RAILROADS ⊕➞222(3)—OBSTRUCTION OF FIRE APPARATUS—EVIDENCE—SUFFI-
CIENCY.

Evidence *held* insufficient to charge defendant railroad company with negligence in obstructing the passage of fire apparatus across its tracks by a moving fast freight train.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 722; Dec. Dig. ⊕➞222(3).]

Foote, J., dissenting.

Appeal from Trial Term, Onondaga County.

Action by the Globe Malleable Iron & Steel Company and others against the New York Central & Hudson River Railroad Company. From a judgment for plaintiffs, defendant appeals. Reversed and dismissed.

Argued before KRUSE, P. J., and FOOTE, LAMBERT, MERRELL, and DE ANGELIS, JJ.

LeRoy B. Williams, of Syracuse, for appellant.

Edward Schoeneck and Jerome L. Cheney, both of Syracuse, and Clayton I. Miller, of Pulaski, for respondents.

DE ANGELIS, J. The plaintiff Globe Malleable Iron & Steel Company, owning and operating a plant for the manufacture of malleable iron in the city of Syracuse (the owner of the building and its contents burned), and its associated plaintiffs, the insurance companies which paid losses, have recovered a judgment against the defendant upon the verdict of a jury for the value of two-thirds of such property consumed, in a fire which occurred in the early morning of January 23, 1912, owing to the alleged negligence of the servants of the defendant operating a freight train in obstructing the passage of some of the fire apparatus of the city on its way over certain streets to extinguish the fire which consumed the property, upon the theory that two-thirds of the property would have been saved if there had been no such obstruction.

While the jury adopted the theory of the plaintiffs, to wit, that two-thirds of the property destroyed might have been saved, but for the alleged negligence of the defendant's servants, and such theory involves a considerable degree of uncertainty, closely approaching

⊕➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

speculation, and although some of the rulings upon the evidence introduced in support of the theory might not be upheld, the fundamental question to be determined is whether or not there was sufficient evidence of defendant's negligence to justify the recovery.   To answer this question we must take a brief survey of the case.

The defendant's tracks, known as the West Shore tracks, run easterly and westerly through the northerly part of the city and in locus in quo are five in number, parallel to each other.   The middle track is the east-bound freight track.   The train claimed to have obstructed the passage of the fire apparatus was an east-bound freight train, consisting of a locomotive and tender and 53 freight cars.   *It was a fast freight train.*   The train did not stop.   The plaintiffs' claim was that it should have stopped and made a passageway for the fire apparatus by what is called cutting the train.   The claim was further made by them that the train moved too slowly, assuming that it might have kept on moving, properly, and that requests were made by some of the firemen, addressed to some of the men on the train, to stop the train and cut it.

Certain streets, which run northerly and southerly and among them Beech street, Teall avenue, next easterly, and Greenway avenue, which latter street is the easterly boundary of the city, cross these tracks at grade.   Between Beech street and Teall avenue are Vine street and Winton street, which are streets running northerly and southerly, but end north of the tracks.   Burnett avenue runs easterly and westerly north of the railroad, and is the nearest street to the railroad on the north.   It is a *paved* street, and is crossed by Beech street, Teall avenue and Greenway avenue, as well as by Vine street and Winton street.

South of the railroad, on Beech street, and about parallel to the tracks, were Canal street, the Erie Canal (crossed by a high bridge), East Water street, the New York Central tracks (subgrade), and East Genesee street.   Beech street, Teall avenue, and Greenway avenue, south of Burnett avenue, are dirt roads.   Greenway, avenue, south of Burnett avenue, is a cul-de-sac, the southerly end of which is a few feet southerly of the southerly end of the building burned, and Teall avenue south of Burnett avenue would be a cul-de-sac of about the same length, but for a dirt road (referred to as a dump road) leading from its southerly end westerly to Beech street.   This dirt road is parallel with the railroad and may be regarded as a continuation of Canal street.

The building in question was situated west of Greenway avenue, and south of and within a few feet of the railroad, and was about 540 feet in length northerly and southerly, and from 120 to 130 feet wide.   It was built of concrete and steel.   It had a large number of windows, starting about 4 feet from the ground, and being 14 feet high and 20 feet wide, each.   The roof was supported by steel trusses 80 feet apart and was covered with gravel laid in tar.   On this 23d day of January, 1912, at some time in the early morning, a fire broke out in the northeasterly part of the building, which, proceeding rapidly, consumed by far the greater part of the building and its contents.

The fire alarm was received at No. 7's engine house and No. 9's

engine house at 4:50 or 4:51. No. 7's engine house is on East Fayette street, between Crouse avenue and University avenue, and so south of the West Shore railroad, and No. 9's engine house is on Oak street, north of Highland avenue, and so north of the West Shore railroad.

No. 7's hose cart responded to the call, manned by the driver and five others. The driver intended to go east on East Fayette street to Beech street, north on Beech street over the Canal bridge and over the West Shore railroad to Burnett avenue, the paved street, thence easterly on Burnett avenue to Greenway avenue, and thence southerly on Greenway avenue across the railroad again to the burning building. When he reached the West Shore railroad on Beech street, he found the crossing occupied by this moving east-bound freight train. He waited a minute, and then went back to Canal street, and thence easterly on the dirt road to Teall avenue, thence northerly on Teall avenue, with the idea that he would cross the railroad and reach Burnett avenue that way, and go thence to the scene of the fire; but when he got to the railroad crossing on Teall avenue he found the same train, still moving easterly, occupying that crossing. The men on the hose cart then left the cart and carried part of their hose across the block easterly, a distance of about 700 feet, to Greenway avenue, where they adjusted their hose to a hydrant in the avenue and put a stream of water on the fire. There is no claim that any one on the train was asked to cut or stop the train till it reached Greenway avenue.

No. 9's hose cart responded to the call, coming from No. 9's engine house down to Burnett avenue, thence easterly to Greenway avenue, and thence southerly along Greenway avenue to the railroad, when its course was obstructed by this same train of cars passing over the crossing. It had just attached its hose to a hydrant on the north side of the railroad when No. 9's engine arrived. Thereupon the hose was attached to the engine, which was ready to cross the track as soon as an opportunity was afforded.

In this connection we are taking the view of the evidence most favorable to the plaintiffs, although some of the plaintiffs' evidence is not very convincing. There was evidence from which the jury might have found that the captain of engine company No. 9, sitting with the driver on the hose cart, when No. 9's hose cart arrived, and within 20 feet of the locomotive as it passed over the Greenway avenue crossing, called out to some man standing on the passageway that leads down to the step to get out from the cab of the locomotive, "Why don't you stop and let us go by?" and saw the lips of the man addressed move, but heard nothing that he said.

There was other evidence from which the jury might have found that, as the train was passing over the Greenway avenue crossing, the chief of the fire department called out to a man walking on the top of the cars to cut the train, and the latter made a disagreeable answer, and that the conductor and a brakeman, one or both standing or walking on the top of the cars, at the request of a man who had come to the fire, not connected with the fire department, swung their lanterns as a signal to stop the train as it passed over this Greenway avenue crossing.

The plaintiffs' evidence of the speed of the train was confined to the speed at the Greenway avenue crossing, and varied from what might be regarded as very slow, almost stopping at intervals, to the rate of 5 miles an hour. The locomotive fireman testified on behalf of the defendant that the train was moving from 6 to 7 miles an hour till it reached the Greenway avenue crossing and was swung up by the flagman of a train ahead.

It appears that there was a freight train ahead of the train complained of, which had been detained by a switch engine, and which had started on its way again just as the train complained of approached it. The buckling of the cars, described by the plaintiffs' witnesses, in the train complained of, might have been accounted for on one of two theories, either the uncertainty of the engineer as to the movement of the train ahead, or the uncertainty of the engineer as to whether he should stop the train on account of the fire.

The jury might have found from the evidence that the train complained of could have been stopped within a space of 30 or 40 feet and cut in two in 2 minutes; that the train occupied from 10 to 15 minutes in passing over the Greenway avenue crossing; that the distance from No. 7's engine house to the scene of the fire was 6,342 feet, and from No. 9's engine house to the scene of the fire 7,636 feet; that No. 7's hose cart could have reached the fire and been in operation, in case there was no interruption, in seven minutes, and No. 9's in 7 or 8 minutes. No. 7's got a stream on the fire in 16 minutes after it left the engine house. No. 9's hose cart claims to have been held up by the train from 10 to 15 minutes.

Bearing in mind that the claim that the servants of the defendant, in the management of this train, were negligent, cannot be sustained because we can now, in the light of what has happened, map out a course for them to have followed that might have been better or wiser, ought we to say the course adopted by them, as disclosed by the evidence most favorable to the plaintiffs, justified the finding of negligence? We think not. The train had the right of way, only to be yielded to the fire department in an emergency. No official, no employé of the city, nor any one else by his mere ipse dixit, could require the men in charge of the train to stop it or divide it into parts. The conduct of men in charge of a train must be governed by the situation presented them in a given case.

There is no evidence that any one of the crew of this train was familiar with the extent and locality of the several streets to have been crossed by the train. There is no evidence that any member of the crew knew the direction in which any of the fire apparatus might come to the fire. The time was long before daylight in the month of January. Assuming it to be true that members of the crew saw the general location of the fire before reaching Beech street, there was nothing in that circumstance to inform them what they might be called upon to do in the management of their train. The train was a fast freight train, very valuable in itself, and presumably laden with valuable property. It was 2,160 feet in length. There were three crossings to consider. Even within the length of the train there were two crossings. Assume that the crew might have seen No. 7's hose cart

as it approached the Beech street crossing from the south; how were they called upon to know that it was going over the crossing and north of the track to a fire that was south of the track and some distance to the east? Assume again that the crew may have noticed this hose cart moving along the dirt road south of and parallel to the tracks; how should they have known what its purpose was in approaching the tracks from the south again at Teall avenue? There is no claim that any call was made upon the crew either to stop at the Beech street crossing or the Teall avenue crossing. Assume that the crew saw the men from No. 7's hose cart carrying the hose across to Greenway avenue south of the track; how should they know but that all the fire apparatus to be used was to come from points south of the track? When the locomotive reached Greenway avenue, assuming that the engineer saw No. 9's hose cart approaching the tracks from the north on Greenway avenue; can it be said that it was anything more than error of judgment if he concluded that he could most quickly clear the crossing by moving on with his train? There was no conflagration imminent, as the fire was in a remote part of the city. While there was evidence from which the jury might have found that he could have stopped his train and made the separation in 2 minutes, can it be said, in view of the fact that he might have been called upon to make a separation in the train at more than one point by reason of the extension of his train over two crossings over which fire apparatus might be coming, it was anything more than an error of judgment if he concluded that he could make the whole train clear this crossing, going at the very moderate rate of 10 miles an hour, in less than $2\frac{1}{4}$ minutes? It turned out unfortunately that he was held up a short time by a train ahead of him, but there was no evidence that there was any reasonable expectation that he would be so held up. While there was evidence that one separation of the train could have been made, and one only, in 2 minutes (the minimum time), the evidence was to the effect that such period might be prolonged indefinitely by the merest, not improbable, accident. Even assuming that the train was moving at the rate of 4 miles per hour, as claimed by the plaintiffs, it would have passed the crossing in 6 minutes.

The circumstance most favorable to the plaintiff is the evidence that No. 9's hose cart was detained at the Greenway avenue crossing from 10 to 15 minutes, as estimated, but not measured by any one who held a watch. Assume this circumstance, and couple with it the unforeseen circumstance of the delay caused by the train ahead, which train might proceed at any second, and then how can it fairly be said, in view of these circumstances and all the other circumstances, that any finding beyond an error of judgment on the part of the engineer is justified?

We think that the judgment and order appealed from should be reversed, with costs, and the complaint dismissed, with costs. All concur, except FOOTE, J., who votes for reversal and new trial.

Judgment and order reversed, with costs, and complaint dismissed, with costs.